CASE NO. 24-1743
========================================================

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ALEXANDRE ANSARI,

*Plaintiff-Appellee*

-vs-

MOISES JIMINEZ,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Eastern District of Michigan

_____

PLAINTIFF-APPELLEE'S BRIEF ON APPEAL

_____

GRANZOTTO & WITTMANN, P.C.

MARK GRANZOTTO
BETH A. WITTMANN
Attorneys for Plaintiff-Appellee
2684 Eleven Mile Road, Suite 100
Berkley, Michigan 48072
(248) 546-4649

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**(This statement should be placed immediately preceding the statement of issues contained in the brief of the party.  See enclosed copy of the 6ᵗʰ Cir. R. 25.)**

Alexandre Ansari,

      Plaintiff-Appellee,                          Case No. 24-1743

-vs-

Moises Jimenez,

      Defendant-Appellant.

_____/

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to 6ᵗʰ Cir. R. 25, Beth A. Wittmann makes the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?   **NO**
        If the answer is YES, list below the identity of the parent corporation or affiliate and the relationship between it and the named party.

2.     Is there publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?   **NO**
        If the answer is YES, list the identity of such corporation and the nature of the financial interest:

 /s/ Beth A. Wittmann_____       __July 10, 2025__
 (Signature of Counsel)                                 (Date)

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS
AND FINANCIAL INTEREST. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT. . . . . . . . . . . . . . . . . .  viii

STATEMENT OF THE ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . .  viii

STATEMENT OF THE CASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      I.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      II.    THERE IS NO MERIT TO DEFENDANT'S ARGUMENT
            THAT THE DISTRICT COURT ERRED IN FAILING TO
            DISMISS THIS ACTION FOR LACK OF SUBJECT MATTER
            JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      III.   THE DISTRICT COURT PROPERLY DENIED QUALIFIED
            IMMUNITY TO JIMENEZ BASED ON EVIDENCE THAT
            HE FAILED TO DISCLOSE EXCULPATORY EVIDENCE IN
            VIOLATION OF *BRADY V. MARYLAND*, 373 U.S. 83 (1963). . . . 34

      IV.   THE DISTRICT COURT PROPERLY DENIED DEFENDANT'S
            MOTION FOR NEW TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

            A.     Wayne County Prosecutor's Subpoenaed Office File. . . . . . . 46

B.      Tusar Memo. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

C.      Verdict Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

D.      Jury Instruction Regarding Attorney/Witness
Communication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

E.      Improper Conduct During Closing Arguments. . . . . . . . . . . 63

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

CERTIFICATION PURSUANT TO FRAP 32(a)(7)(C). . . . . . . . . . . . . . . . . 67

DESIGNATION OF RECORD ON APPEAL. . . . . . . . . . . . . . . . . . . . . . . . 68

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

# INDEX OF AUTHORITIES

**Page**

## Cases

*Anderson v. City of Blue Ash*,
    798 F.3d 338 (6th Cir.2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Armisted v. State Farm Mut. Auto. Ins. Co.*,
    675 F.3d 989 (6th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Ayers v. City of Cleveland*,
    773 F.3d 161 (6th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Balsley v. LFP, Inc.*,
    691 F.3d 747 (6th Cir.2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Berry v. Schmitt*,
    688 F.3d 290 (6th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Boggs v. City of Cleveland*,
    655 F.3d 516 (6th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Brady v. Maryland*,
    373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii, 13

*Buczkowski v. Buczkowski*,
    88 N.W.2d 416 (Mich. 1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*District of Columbia Court of Appeals v. Feldman*,
    460 U.S. 462 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
    544 U.S. 280 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Ford v. County of Grand Traverse*,
    535 F.3d 483 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Fowler v. Benson*,
924 F.3d 247 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Gregory v. City of Louisville*,
444 F.3d 725 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Heck v. Humphrey*,
512 U.S. 477 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii, 27

*Hubbell v. FedEx SmartPost, Inc.*,
933 F.3d 558 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Jackson v. City of Cleveland*,
925 F.3d 793 (6th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Larson v. Domestic & Foreign Commerce Corp.*,
337 U.S. 682 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Moldowan v. City of Warren*,
578 F.3d 351 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Moody v. United States*,
958 F.3d 485 (6th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Rooker v. Fidelity Trust Co.*,
263 U.S. 413 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Skatemore, Inc. v. Whitmer*,
40 F.4th 727 (6th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Spurlock v. Satterfield*,
167 F.3d 995 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Stickler v. Greene*,
    527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Sykes v. Anderson*,
    625 F.3d 294 (6th Cir.2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Dotson*,
    715 F.3d 576 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Feinman*,
    930 F.2d 495 (6th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Wilson v. Layne*,
    526 U.S. 603 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Zamlen v. City of Cleveland*,
    906 F.2d 209 (6th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**Michigan Court Rules**

MCR 6.501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

MCR 6.502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

MCR 6.502(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

MCR 7.200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

MCR 7.300 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**6th Circuit Rules**

6th Cir. R. 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

6th Cir. R. 29(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

## Federal Rules

Fed. R. Civ. P. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 50(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Fed. R. Civ. P. 50(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. R. Evid. 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Fed. R. Evid. 902(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

FRAP 32(a)(7)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

## Statutes

28 U.S.C. § 1738 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

28 U.S.C. §1257 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellee hereby requests oral argument in this matter. Because of the complexity of the district court factual record and the rationale for the district court's ruling, plaintiff would suggest that the Court might derive some benefit from oral argument.

# STATEMENT OF THE ISSUES PRESENTED

Whether the defendant's jurisdictional argument predicated on the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994) lacks merit.

Whether the district court properly denied qualified immunity to defendant based on defendant's failure to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

Whether the district court properly exercised its discretion in denying defendant's motion for a new trial.

# STATEMENT OF THE CASE

In the early evening hours of September 22, 2012, three individuals – Ileana Cuevas, her sister Rosalind Barley, and Barley's boyfriend Miguel Figueroa – were involved in a triple shooting on Cicotte Street in Detroit. (RE.64-2:Investigator's Report;PageID#1202-1205). The shooting occurred as Barley and Cuevas pulled up in their vehicle to the front of Figueroa's house. As Figueroa was getting into the back seat of the vehicle, a black male approached and began firing multiple shots into the vehicle. (*Id.*;RE.64-3:Barley Statement,at 1-2,PageID#1207-1208). Cuevas, who was 15 years old at the time, was killed and Barley and Figueroa were both injured in the shooting. (RE.64-2:Investigator's Report;PageID#1202-1205).

Moises Jimenez, a Detroit Police Department ("DPD") detective, was assigned as the officer in charge of the investigation of the shooting.

Barley provided a statement to police at the hospital while being treated for her injuries. (RE.64-3:Barley Statement;PageID#1207-1209). Barley described the shooter as an "Unk[nown black male], 20[years old], tall poss[ibly] 6[feet tall], fat (not sloppy) 300 lbs," with a dark complexion, possible braids or cornrows to the back, unknown facial hair, and wearing a black hoodie and black pants. (*Id.*). Barley stated that the shooter was armed with a "big gun (like some type of machine gun)" that was wrapped in a white cloth. (*Id.*).

1

Barley indicated to police that she recently had been having problems with her ex-boyfriend, Jose Daniel Soria-Sandoval. (*Id.*). Barley stated that approximately one month prior to the shooting, she and Figueroa were driving in a car that Sandoval had purchased for her when Sandoval crashed into her car because he wanted the car back and "was upset about me leaving." (*Id.*). Barley indicated that Sandoval was on federal probation for a drug case. (*Id.*).

Police interviewed two other individuals who did not witness the shooting but witnessed an individual running from the scene after the shooting. Leola Marlow, who lives across the street from where the shooting occurred, stated that she heard gunshots and looked out her kitchen window "and I saw a gentleman running from the alley and get in the passenger seat of a [light] colored gold SUV. He was pulling a stocking cap from his head and shoving it down his back." (RE.64-4:Marlow Statement;PageID#1211-1212). Marlow described the individual as "about 5'11"-6'2", a big guy maybe 300 lbs, he had on [a dark] hoodie jacket and blue jeans, a low haircut and dark complex[ion], not [too] dark. He looked to be somewhere about 40 to 50 years old, he wasn't a young guy." (*Id.*). Marlow indicated that the shooter was "a big guy and was breathing like he was out of breath when he ran from the alley." (*Id.*).

The other individual, Shawn Lindsey, also heard gun shots and witnessed a

man running through the alley. (RE.64-5:Crime Report;PageID#1214). Lindsey stated that he observed "a heavy set black male about 6 foot tall, wearing dark clothing come east out of the alley off of Gilbert south of Morse at a fast pace." (*Id.*).

The day after the shooting, on September 23, 2012, the FBI turned over an anonymous tip to Detroit Police detective Theo Miller of the DPD Homicide Squad. (RE.64-8:FBI Tip;PageID#1224). That tip provided "info on triple shooting on Cicotte" and identified the shooter as "Solo," a black male, "30's heavy set." (*Id.*). The tipster provided a telephone number and address for the shooter and indicated that the shooter "sells heroin." (*Id.*).

Four days later, on September 26, 2012, Miguel Figueroa's brother, Tommy Edwards, was shot and killed in front of his residence. (RE.64-6:Flores-Llamas Statement;PageID#1216-1218). Jimenez was also assigned to the investigation into Edwards' death.

That same day, Detective Jimenez received a "Crime Stoppers" tip regarding the September 22 shooting on Cicotte Street. (RE.64-9:Crime Stoppers Tip;PageID#1226). The caller identified the shooter as "Sousa" and described the shooter as a Hispanic male, 28 years old, approximately 230 pounds, and 5 foot 8 inches tall, with "4 inch long dark brown dreadlocked hair" and a 2-inch long beard. (*Id.*). The caller indicated that the suspect is the leader of a gang "known as Sousas

3

and Friday's Boys." (*Id.*).

Jimenez later testified at his deposition that he checked his sources for a "Sousa" and was directed to Mr. Ansari. (RE.64-10:Jimenez Dep,at 57-63;PageID#1243-1244). Jimenez admitted that Mr. Ansari is not 5 foot 8 inches tall and 230 pounds, and that he was instead around 5 foot 11 inches tall and 175 pounds. (*Id.*,at 62-63;PageID#1244). Jimenez also admitted that Mr. Ansari did not have a two-inch long full beard. (*Id.*). Notably, Mr. Ansari is not Hispanic.

Jimenez met with two members of the Drug Enforcement Administration ("DEA") the next day, September 27, 2012. (RE.64-21:DEA Report;PageID#1400-1401). Jimenez advised the DEA agents that he was investigating Sandoval as a suspect in the September 22 shooting. (*Id.*). The DEA agents provided background information on Sandoval, including known associates and the GPS tracking information from Sandoval's vehicle on the date of the shooting and the days before the shooting. (*Id.*). The DEA agents informed Jimenez that Sandoval was a major drug dealer in Michigan with connections to Mexican drug cartels, and was responsible for bringing a majority of the heroin into the metro-Detroit area from the cartels. (RE.64-10:Jimenez Dep,at 45-47;PageID#1240). The GPS tracking information revealed that Sandoval was in the immediate area of the September 22 and September 26 shootings. (RE.64-10:Jimenez Dep,at 53-54,68-

69;PageID#1242,1245-1246;RE.64-19:CIU Memo,at 10,16-17;PageID#1383,1389-1390).

Barley provided a second statement to Jimenez on September 27, 2012. (RE.64-7:Barley Statement;PageID#1220-1222). She again described the shooter as a "black male, like around mid-20's, 24-25, heavy, tall, like 6-00 feet, dark complexed [sic], very dark, wearing a black hoodie and black pants, all black." (*Id.*).

Jimenez showed Barley a photo array that included a photograph of Dominic Crawford, a known associate of Sandoval. (RE.64-30:Photo Array;PageID#1632-1634;RE.64-10:Jimenez Dep,at 76-78,129;PageID#1247-1248,1261). Barley did not identify anyone in the photo array. (RE.64-30:Photo Array;PageID#1632-1634).

On October 2, 2012, Figueroa was shown a photo array that included a photograph of Larry Davis, another known associate of Sandoval. (RE.64-32:Photo Array;PageID#1638;RE.64-31:Davis Image;PageID#1636;RE.64-10:Jimenez Dep, at 76,79-80,82-83,129;PageID#1247-1249,1261). Figueroa did not identify anyone in the photo array. (RE.64-32:Photo Array;PageID#1638).

Figueroa provided a statement to Jimenez on October 3, 2012. (RE.64-11:Figueroa Statement;PageID#1280-1282). Figueroa described the shooter as a black male, "about 25-28, tall, 6-01, medium built [sic], dark complexed [sic], wearing a black top and gray joggers." (*Id.*).

Figueroa also indicated to Jimenez that Barley had been having problems with her ex-boyfriend and similarly described the incident where her ex-boyfriend hit Barley's car. (*Id.*). When asked if he had ever taken anything from Barley's ex-boyfriend, he stated the "only thing I took was his girl." (*Id.*).

Sandoval was arrested on October 5, 2012 for violating the terms of this supervised release. (RE.64-21:DEA Report;PageID#1403-1410). The violation resulted from the issuance of a felony arrest warrant for Sandoval for the aggravated assault of Barley and Figueroa that occurred in August 2012, when Sandoval crashed his vehicle into their vehicle. (*Id.*;RE.64-22:Sandoval Warrant;PageID#1415-1417).

Sandoval was found with ten cellular telephones at the time of his arrest, and Jimenez obtained a search warrant permitting the downloading of all available data from the seized telephones. (*Id.*;RE.64-23:Search Warrant;PageID#1419-1423). Jimenez included a statement in the search warrant indicating that the cellphone data was needed because "victims are often killed by [a] known person and often have contacted the[m] via cellular telephone" and perpetrators "often have contact with other perpetrators and/or victims at or around the time of the incidents and perpetrators often tell their associates of their activities and/or participation of the incidents." (RE.64-23:Search Warrant,¶10;PageID#1421). After the search warrant was signed, the DEA downloaded the cell phone data from Sandoval's ten phones and

provided the data to Jimenez. (RE.64-21:DEA Report;PageID#1406).

Jimenez later testified at his deposition that it was his belief that Sandoval orchestrated the September 22 and September 26 shootings and that Mr. Ansari was the "hitman" for Sandoval. (RE.64-10:Jimenez Dep,at 54-56,72-73;PageID#1242, 1246-1247). Jimenez stated that it was his "theory" that Figueroa and Edwards were shot because Figueroa stole narcotics and/or money from Sandoval, and because Sandoval was jealous that Figueroa was dating Barley. (*Id.*,36-37,44-45;PageID#1237-1240). Jimenez admitted, however, that none of the evidence, including the data obtained from Sandoval's cellular telephones, showed any connection between Mr. Ansari and Sandoval. (*Id.*,at 33-35, 55-57, 67;PageID#1237, 1242-1243,1245).

Despite the lack of any evidence connecting Mr. Ansari with Sandoval, Jimenez presented Figueroa with a photo array on October 11, 2012, which included Mr. Ansari's photograph. (RE.64-12:Photo Array;PageID#1284). Figueroa identified Mr. Ansari as the shooter. (*Id.*). Jimenez presented Barley with a photo array the next day, October 12, 2012, which again included Mr. Ansari's photograph. (RE.64-13:Photo Array;PageID#1286). Unlike Figueroa, Barley did not identify anyone in the photo array. (*Id.*).

On October 12, 2012, Jimenez wrote a warrant request for Mr. Ansari's arrest

based on Figueroa's identification. (RE.64-2:Investigator's Report;PageID#1202-1205). The warrant request did not mention Sandoval or include a motive for the shooting. (*Id.*). A warrant was issued for Mr. Ansari for first degree premeditated murder, two counts of assault with intent to murder, and felony firearm. (*Id.*).[1]

At his preliminary examination held on November 7, 2012, the state court granted Mr. Ansari's request for a live lineup to be presented before Barley and Figueroa and adjourned trial in order to allow the live lineup to occur. (RE.59-14:Tr.11/7/12,at 20-23;PageID#1002-1005).

The live lineup occurred on November 19, 2012. (RE.59-15:Statements; PageID#1008-1009). Both Barley and Figueroa identified Mr. Ansari as the shooter at the live lineup. (*Id.*).

At Mr. Ansari's preliminary examination, both Barley and Figueroa identified Mr. Ansari as the shooter. (RE.59-16:Tr.11/20/12,at 7-8;PageID#1013-1014;RE.64-14:Tr.10/20/12,at 65-66;PageID#1290-1291). Barley testified at the preliminary examination that she spoke with Figueroa about the case and they "can't figure out what happened. We don't know why this happened to us." (RE.64-14:Tr.10/20/12,at 82;PageID#1307). Based upon the witnesses' identification of Mr. Ansari as the

---

[1] Mr. Ansari also was charged in conjunction with the shooting death of Mr. Edwards. He was acquitted on all charges. (RE.64-19:Memo;PageID#1374).

shooter, the state court found probable cause to believe that Mr. Ansari committed the crimes as charged and he was bound over for trial. (RE.59-16:Tr.11/20/12,at 97-100,PageID#1028-1031).

The charges against Mr. Ansari initially proceeded to trial in May 2013. Ms. Marlow, one of the neighbor eyewitnesses, testified at trial that she heard gunshots and then saw "a big man – a heavy man," close to 300 pounds and "really tall" running down the alley adjacent to her house. (RE.64-15:Marlow Testimony, at 132-134;PageID#1323-13). Ms. Marlow indicated that she recognized Mr. Ansari from the neighborhood and testified that Mr. Ansari was not the individual she saw getting into that vehicle ("Nope. Nope–he's too small."). (*Id.*,at 135;PageID#1326).

The prosecutor noted during closing arguments that there was a lack of evidence of motive, citing Barley's testimony that she did not know why the shooting occurred. (RE.64-16:Tr.5/9/13,at 38;PageID#1333). The prosecutor indicated to the jury that she only needed to demonstrate that Mr. Ansari was the shooter, and admitted that the case "comes down to identification." (*Id.*, at 38, 42;PageID#1333,1337). The first trial resulted in a hung jury. (RE.64-19:Memo;PageID#1374).

Mr. Ansari was tried a second time in September 2013. Ms. Marlow testified at the second trial and again described witnessing a heavyset man running through the

alley next to her home after she heard gunshots. (RE.64-17:Tr.9/10/23,at 6-9, PageID#1343-1346). She again indicated that Mr. Ansari was not the person she witnessed running in the alley because his stature "is too small." (*Id.*,at 9-10, 14-15, 24;PageID#1346-1347, 1351-1352, 1361).

During closing arguments, the prosecuting attorney maintained that there was a lack of evidence of motive and again cited Barley's testimony that she did not know why the shooting occurred. (*Id.*,at 37,PageID#1367). Mr. Ansari was ultimately convicted on one count of first degree murder, two counts of assault with intent to murder, and one count of felony firearm. He was sentenced to mandatory life in prison without the possibility of parole. (RE.64-19:Memo;PageID#1374).

In 2018, shortly after the Wayne County Prosecutor's Office formed the Conviction Integrity Unit ("CIU"), headed by attorney Valerie Newman, the CIU began investigating Mr. Ansari's claims of innocence. (RE.64-19:CIU Memo 2/14/19;PageID#1374). The CIU investigation resulted in a memorandum drafted by lead attorney Carole Stanyar, which summarized the new evidence uncovered during the CIU investigation. (*Id.*). The CIU found that Sandoval had carried out both the September 22 and the September 26 shootings because Barley and Figueroa "allegedly stole 3.5 grams of raw heroin from Barley's ex-boyfriend, Jose Sandoval, in the Spring/Summer of 2012." (*Id.*,at 1;PageID#1374). The CIU described Sandoval

as a "known drug dealer with significant ties to a Mexican Cartel" and found that Sandoval "was being investigated by the DEA at the time of the murders." (*Id.*).

The CIU investigators interviewed Jimenez as part of their investigation. (*Id.*,at 4-5;PageID#1377-1378;RE.64-24:CIU Memo 9/19/18;PageID#1425-1430). Notably, the CIU found that Jimenez had "admitted to deliberately failing to investigate Jose Sandoval" due to Sandoval's ties to a Mexican drug cartel because Jimenez believed that his family in Mexico would be killed if he pursued Sandoval. (RE.64-19:CIU Memo 2/14/19, at 4-5,11-12;PageID#1377-1378,1384-1385). The CIU concluded that Jimenez had "distorted every aspect of his investigation and the truth-telling process" by failing to investigate or review relevant evidence and by concealing exculpatory information from the prosecutor. (*Id.*).

The CIU found that Jimenez failed to disclose to the prosecutor the information obtained from Sandoval's ten cellular telephones as well as the GPS tracking information from Sandoval's vehicles. (RE.64-19:CIU Memo 2/14/19,at 4-5;PageID#1377-1378). The CIU determined that the phone and GPS tracking evidence put Sandoval at the scene of the getaway route. (*Id.*). The phone data also showed that Sandoval was in contact with the likely perpetrators of the shooting and also contained a photograph of a heavy-set black male, which was sent to Sandoval shortly after the Edwards shooting. (*Id.*). The CIU determined that the evidence

"suggests strongly that Sandoval was involved in, and the likely orchestrator of, the murder of Cuevas and the assaults on Barley and Figueroa." (*Id.*).

As a result of the CIU investigation and newly-discovered evidence, Mr. Ansari's criminal convictions and sentences were vacated and all criminal charges against him were dismissed on March 15, 2019. (RE.75-1:Stipulated Order Vacating Convictions,PageID#1908-1909). The order was signed by the Judge Thomas M.J. Hathaway and indicated that the parties agreed that newly discovered evidence and the prosecuting attorney's office own investigation warranted relief from the conviction. (*Id.*).

After Mr. Ansari's conviction was vacated, the Detroit Police Department conducted an investigation of Jimenez. (RE:64-25:DPD Investigation Report;PageID#1432-1444). The investigator, Lieutenant Marc DeLuca, determined that Jimenez "willfully withheld investigatory information and potential evidence" from the prosecution at the time of presenting the arrest warrant for Mr. Ansari and during his subsequent trials, including the Sandoval information. (RE.64-25:DPD Investigation Report;PageID#1440-1441).

Lieutenant DeLuca drafted a warrant request for Jimenez for obstruction of justice "by a willful failure to present all relative facts that were provided during his investigation" to the prosecuting attorney. (*Id.*;PageID#1432). He later testified that

Jimenez retired from the police department and the investigation "became a moot point at that time." (RE.64-28:DeLuca Dep,at 42;PageID#1583).

Mr. Ansari filed a complaint on March 18, 2020 in the United States District Court for the Eastern District of Michigan, alleging that Jiminez violated his constitutional rights. (RE.1:Complaint,PageID#1-18).[2] He alleged Fourth Amendment violations for fabrication of evidence and malicious prosecution, and he alleged Fourteenth Amendment violations for withholding exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.*).

Erika Tusar, the prosecutor who tried the cases against Mr. Ansari, testified at deposition that she would not have withheld exculpatory impeachment evidence from the defense and that she would have turned over all of the evidence that Jimenez gave her. (RE.64-27:Tusar Dep, at 75;PageID#1533). She testified, however, that exculpatory and impeachment evidence was not turned over to her by Jimenez. (RE.64-27:Tusar Dep,at 46-50,53-54,59-63, 79,85-87,97-100,206-209;PageID#1526-1530,1534,1536,15391540,1565-1567).

Ms. Tusar confirmed that all of this evidence should have been turned over to her. (*Id.*,at216;PageID#1569). Ms. Tusar also confirmed that the Sandoval

---

[2] Plaintiff also named the City of Detroit as a party in the complaint. The district court entered an order of dismissal of Mr. Ansari's claims of liability as to the City of Detroit on March 4, 2022. (RE.56:Order;PageID#853-857).

information would have undermined her theory of the case that this was a random shooting without any clear motive. (*Id.*,at 57-60;PageID#1529).

Jimenez testified at deposition that he turned over everything that was in his file to the prosecutor's office. (RE.64-10:Jimenez Dep,at 55,74-75,109-111,192-193;PageID#1242,1247,1256-1257,1276-1277). He testified that the prosecuting attorney was aware of his theory that Sandoval had commissioned the "hit" on the victims, and aware of the fact that Jimenez was unable to uncover any evidence connecting Mr. Ansari with Sandoval. (*Id.*,at 38,55-57,68-69,71-72,145-147, 177;PageID#1238,1242-1243,1245-1246,1265,1273). He admitted, however, that he never memorialized his theory into a memo or other case file note. (*Id.*,at 56, 69;PageID#1242,1246).

Jimenez also testified that he was aware of the "long-standing principle" that an officer was required to turn over exculpatory evidence, which includes evidence leading to another suspect as well as impeachment evidence. (*Id*.,at 29-32,42-44,180-181;PageID#1236,1239,1273-1274). He admitted that the FBI tip, his Sandoval theory, and the DEA tracking information on Sandoval were all exculpatory evidence that had to be turned over. (*Id.*,at 56-57,63-67,69-70,73-74;PageID#1242-1247). He also denied that he was afraid of retaliation from Sandoval if he pursued him as a suspect in this case. (*Id.*,at 197;PageID#1278).

Jimenez filed a motion for summary judgment seeking dismissal of all of Mr. Ansari's claims. (RE.59:Motion,PageID#866-902). The district court denied the motion, holding that the Sandoval evidence "undermines the State's theory of the case," noting that Ms. Tusar admitted that she would have turned over the evidence under *Brady* and that the evidence would have undermined her theory of the case. (RE.70:Opinion;PageID#1812-1832). The district court also found that the evidence would have impeached the "star witnesses" about their drug trade connections to Sandoval, and would have "marred" Jimenez's own credibility and questioned his investigation. (*Id.*,at 16;PageID#1827). The court held:

> Even though the evidence did not exonerate Plaintiff, it crushed the credibility of key witnesses and it very likely would have changed the jury's verdict. To confirm, "[t]his was not a case where the evidence against [] Plaintiff[] was strong." *Sykes*, 625 F.3d at 321. It turned on eyewitness identification and a distorted investigation.

> (*Id.*,at 16;PageID#1827).

Jimenez filed a motion for reconsideration of the district court's August 23, 2022 opinion and order. (RE.71:Motion;PageID#1833-1856). Jimenez attached to the motion an internal memorandum prepared by Assistant Prosecuting Attorney Tusar in October 2013, identifying a federal investigation regarding Sandoval (hereinafter referred to as the "Tusar Memo"). (RE.71-1:Tusar Memo;PageID#1858-1859;RE.71-2:Jimenez Affidavit;PageID#1861-1863). Jimenez argued that Tusar Memo

demonstrates that he provided all of the Sandoval information to the prosecuting attorney prior to Mr. Ansari's criminal trial.

The district court denied the motion for reconsideration on September 9, 2022. (RE.72:Order;PageID#1864-1867). The district court held that an issue of material fact remains as to whether Jimenez disclosed all or some of the Sandoval evidence to the prosecutor, given Tusar's testimony that she did not receive the Sandoval evidence from Jimenez. (*Id.*,at 3;PageID#1866).

Jimenez filed a motion to dismiss Mr. Ansari's claims for lack of subject matter jurisdiction. (RE.75:Motion:PageID#1872-1906). Jimenez argued that the district court lacked subject matter jurisdiction over Mr. Ansari's claims under the *Heck* doctrine because Mr. Ansari's conviction was vacated by entry of a stipulated order rather than via the filing of a motion. (*Id.*).

The district court issued an order on October 31, 2022, denying Jimenez's motion to dismiss. (RE.80:Order;PageID#1974-1978). The district court found that *Heck* was inapplicable here because Mr. Ansari's underlying State court convictions and sentences were vacated. (*Id.*,at 4-5;PageID#1977-1978). The district court also concluded that it lacked authority to decide whether the State court followed State procedure when it vacated Mr. Ansari's conviction. (*Id.*).

Jimenez filed a motion for reconsideration of the October 31, 2022 order,

which the district court denied on November 9, 2022. (RE.81:Motion;PageID#1979-1995;RE.83:Order;PageID#1998-2001).

The parties filed several motions in limine prior to the start of trial. One motion filed by Mr. Ansari sought to exclude evidence or argument regarding the Tusar Memo. (RE.91:Motion;PageID#2102-2116;RE.116-2:Exhibit;PageID#2764-2765).

The district court issued an omnibus opinion and order on June 20, 2023, granting in part and denying in part Mr. Ansari's motion in limine. (RE.130:Opinion;PageID#2924-2933). The district court held that the Tusar Memo contained both (1) highly relevant information that is probative of whether Tusar knew of the allegedly withheld *Brady* evidence regarding Sandoval, and (2) irrelevant information about the murder cases and criminal investigations "that are highly prejudicial and not at issue in the present trial." (*Id.*,at 6;PageID#2929). The district court concluded that Jimenez "may introduce only the title of the document, its caption, and paragraph seven" of the Tusar Memo, and held that the remainder of the memorandum "is inadmissible and must be redacted." (*Id.*). In holding that paragraph seven was admissible, the district court held that paragraph seven did not constitute hearsay because it was offered only to show that Tusar was aware of the *Brady* evidence regarding Sandoval "and not for the truth of the matter asserted in any of the statements" contained in paragraph seven. (*Id.*,at 6-7;PageID#2929-2930).

Paragraph seven of the Tusar Memo, which was the only admissible portion of the memo pursuant to the district court's decision, reads as follows:

> There was a separate FBI investigation going on at this time which the OIC can explain much better but briefly Rosalind Barley dated a previous boyfriend by the name of Jose Sandoval, a high ranking drug dealer. There was an altercation between Sandoval, Ms. Barley and Mr. Figeroa [sic] which was the subject of a separate D.V. case before these murders. However, when the little girl got killed in error there was "a lot of anger about it in the community." The Special Ops guys also had information that the Defendant was associated with Jose Sandoval. Eventually, while the first case was in progress Sandoval got time in the Federal System. Please note; Mr. Edwards was also a ranking drug associate but with a different group. It is believed this may have all been connected but because it was over lapping with "an undercover FBI situation" none of this was ever able to be disclosed.

(RE.71-1:Tusar Memo;PageID#1858-1859).

Mr. Ansari presented the testimony of several witnesses at trial, including the two parties in this case; attorney Todd Perkins, Mr. Ansari's criminal defense expert; Carole Stanyar, the CIU investigator; Gerald Karafa, Mr. Ansari's criminal defense attorney; Erika Tusar, the prosecuting attorney; federal DEA agent Craig Michelin; and Gerald Shiner, Mr. Ansari's psychiatric expert. The evidence at trial largely mirrored the evidence that had been obtained during discovery.

Mr. Ansari's witnesses testified that Jimenez failed to produce exculpatory evidence to the prosecutor, including the Sandoval GPS tracker information, the data from Sandoval's cellular telephones showing no connection with Mr. Ansari,

Jimenez's theory that the shooting was a "hit" orchestrated by Sandoval because of the theft of heroin from Sandoval by Figueroa and Barley, information that Sandoval was a major drug dealer in Michigan with connections to Mexican drug cartels, and the FBI tip identifying "Solo" as the shooter. (RE.169:Perkins,Tr.2/8/24,at 64-71,75-76,80,85-90,129-132;PageID#3997-4004,4008-4009,4013,4018-4023,4062-4065;RE.169:Stanyar,Tr.2/8/24,at 146-149,154-156,162-173,181-183,185,206-208,218-219;PageID#4079-4082,4087-4089,4095-4106,4114-4116,4118,4139-4141,4151-4152;RE.170:Stanyar,Tr.2/9/24,at45-46;PageID#4201-4202;RE.171:Karafa,Tr.2/12/24,at114-116,119-123;PageID#4501-4503,4506-4510;RE.171:Tusar,Tr.2/12/24,at 142-160,168-170,227-229,233-234;PageID#4529-4547,4555-4557,4614-4616,4620-4621). Mr. Perkins, Mr. Ansari's criminal defense expert, opined that the failure to produce this exculpatory evidence prejudiced Mr. Ansari's defense in his criminal trial by affecting his ability to impeach the testimony of Jimenez, Figueroa, and Barley and create doubt upon the identification of him as the shooter. (RE.169:Perkins,Tr.2/8/24,at71-74,89,112-115,121-122,132-133;PageID#4004-4007,4022,4045-4048,4054-4055,4065-4066).

Jimenez admitted at trial that his obligation under *Brady* required him to disclose exculpatory and impeachment evidence to the prosecutor.(RE.170:Tr.2/9/24,at 78-81;PageID#4234-4237). He conceded that this obligation extended to include

evidence that is not in recorded form as well as evidence that would show that key witnesses were lying or would otherwise counter the prosecution's theory of the case. (*Id.*).

Jimenez testified that he received information from a confidential source regarding Sandoval's background as a major drug dealer in Michigan and that the shooting was a "hit" orchestrated by Sandoval because of the theft of heroin by Figueroa and Barley. (RE.170:Tr.2/9/24,at 80-87,97-108;PageID#4236-4243,4253-4264). He acknowledged that the Sandoval information he received from his source was important because it gave motive and context to the murder and countered the prosecutor's statement to the jury that this was a random act. (*Id.*,at 97-108,116-118;PageID#4253-4264,4272-424). He also admitted that he obtained a tip from the FBI identifying "Solo" as the shooter. (*Id.*,at 138-141;PageID#4294-4297). He conceded that all of this information should have been turned over to the prosecutor. (*Id.*,at 116-118,139-141;PageID#4272-4274,4295-4297).

Jimenez asserted, however, that he fulfilled his obligation to provide the Sandoval information to the prosecuting attorney because he informed the prosecutor of all of the information he obtained regarding Sandoval, including the cell phone data showing no connection between Mr. Ansari and Sandoval, Sandoval's GPS information, and the tips received from various sources. (RE.170:Tr.2/9/24,at 117-

118,147,150-155;PageID#4273-4274,4303,4306-4311;RE.171:Tr.2/12/24,at 25-26, 53-55,60-62,74-75;PageID#4412-4413,4440-4442,4447-4449,4461-4462). Jimenez testified that, although he could not prove it, there was "no doubt" that Sandoval was "clearly" connected to the homicide here. (RE.170:Tr.2/9/24, at 160,227-229;PageID#4316,4383-4385).

Ms. Tusar testified, however, that she was not informed of the Sandoval information during Mr. Ansari's trials. (RE.171:Tusar, Tr.2/12/24,at 142-160,168-170,202,227-229,233-234;PageID#4529-4547,4555-4557,4589,4614-4616,4620-4621). Ms. Tusar testified that she did not know about Sandoval's background or the evidence related to Sandoval as the person behind the shooting and that the shooting was a hit on Barley and Figueroa because of the theft of heroin from Sandoval. (*Id.*). She also testified that she was unaware of the DEA tracking information on Sandoval, the cellular telephones downloaded by the DEA, the fact that the download showed no connection between Mr. Ansari and Sandoval, or the FBI tip identifying "Solo" as the shooter. (*Id.*). Ms. Tusar also testified that she was unaware of the domestic violence case involving Sandoval, Barley, and Figueroa. (*Id.*).

When questioned regarding her written memorandum, which referenced the Sandoval federal investigation, Ms. Tusar testified that she only learned of an ongoing federal investigation of Sandoval during the Edwards murder trial, which

occurred after Mr. Ansari had been convicted. (*Id.*, at 193-201, 206, 213-218, 229-230;PageID#4580-4588, 4593, 4600-4605, 4616-4617). She maintained, however, that she did not learn any detailed information regarding that federal investigation. (*Id.*).

Ms. Tusar was asked to review the unredacted version of her memorandum and confirmed that she mentioned the Cuevas murder trial in other parts of the memorandum. (*Id.*,at 190-191, 242-243;PageID#4577-4578, 4629-4630). Ms. Tusar explained that she referenced the Cuevas murder trial in the memorandum because Edwards and Figueroa were brothers, which established a "connection" between the two cases. (*Id.*).

Ms. Tusar also testified that a police officer's theory of the case, even if derived from confidential sources, should be included in the Investigator's Report, and opined that all information should be presented to allow the prosecutor to properly assess the evidence in the case. (*Id.*,at 147-148,150,221-222,224-225,238;PageID#4534-4535,4537,4608-4609,4611-4612,4625). Ms. Tusar confirmed that the Sandoval information should have been provided to her and that it was significant information both because it was contrary to her theory of the case that there was no motive for the Cuevas murder and because it would have undermined the credibility of Barley and Figueroa. (*Id.*,at 143-147;PageID#4530-4534).

Before the defense rested, the district court heard Jimenez's oral motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. (RE.173:Tr.2/14/24, at 104-106;PageID#4876-4878). Notably, although Jimenez briefly mentioned qualified immunity in passing during the oral Rule 50(a) motion, he did not argue in support of his entitlement to immunity. Counsel for Jimenez only mentioned qualified immunity in two limited contexts. The first was in response to a question posed by the district court regarding a "novel" theory that the failure to turn over exculpatory evidence could change the outcome because it may influence a prosecutor's charging decision. (*Id.*,at 116-117;PageID#4888-4889). The only other time that qualified immunity was mentioned was in the context of defendant's argument that other circuits have required "intentional" withholding of exculpatory evidence in order to bring a civil suit. (*Id.*,at 128-129;PageID#4900-4901).

After hearing arguments from the parties, the district court took the Rule 50(a) motion under advisement.(*Id.*,at 147;PageID#173).

During closing arguments, counsel for Mr. Ansari suggested to the jury that an award of $20,720,000 in past compensatory damages and an award of $5,475,000 in future compensatory damages, for a total of $26,195,000, would adequately compensate Mr. Ansari for the deprivation of his constitutional rights. (*Id.*,at 47-49;PageID#5012-5014). He also suggested an award of $26,195,000 in punitive

damages. (*Id.*, at 50;PageID#5015).

Following deliberations, the jury returned a verdict on February 16, 2024. (RE.162:Verdict;PageID#3743-3744;RE.175:Tr.2/16/24,at 8;PageID#5115). The jury found that Jimenez violated Mr. Ansari's Fourteenth Amendment right to due process and awarded Mr. Ansari $6,500,000 in past compensatory damages and $3,500,000 in future compensatory damages, for a total of $10,000,000. (*Id.*). The jury, however, declined to award punitive damages. (*Id.*).

The district court entered an order denying Jimenez's Rule 50(a) motion on April 2, 2024. (RE.178:Order;PageID#5132-5139). The district court noted that it had already ruled on all of the arguments raised in the motion when it denied in part defendant's motion for summary judgment and defendant's motion to dismiss for lack of subject matter jurisdiction. (*Id.*). Notably, the district court did not address qualified immunity in its order denying the Rule 50(a) motion.

The district court entered judgment in favor of Mr. Ansari and against Jimenez in the amount of $10,000,000 on April 2, 2024. (RE.179;Judgment;PageID#5141-5142).

Jimenez filed a post-judgment motion for new trial and a renewed motion for judgment as a matter of law. (RE.180:New Trial Motion;PageID#5143-5177;RE.181:Renewed Motion;PageID#5182-5218). Jimenez argued that a new trial

was proper based upon several errors made by the district court during trial. (RE.180:New Trial Motion;PageID#5143-5177).

In the renewed motion for judgment as a matter of law, Jimenez raised the same issues raised in his Rule 50(a) motion, only this time he argued qualified immunity. (RE.181:Renewed Motion,at 2-4;PageID#5195-5197).

The district court issued an opinion and order on August 19, 2024, denying both the motion for new trial and the renewed motion for judgment as a matter of law. (RE.189:Opinion;PageID#5512-5534). In that order, the district court denied defendant's motion for a new trial, holding that none of the grounds raised by the defendant warrant a new trial. (*Id.*,at 10-23;PageID#5521-5534). The district court also denied defendant's renewed motion for judgment as a matter of law for the same reasons stated in its orders denying Jimenez's Rule 50(a) motion and motion to dismiss. (*Id.*,at 5-8;PageID#5516-5519).

The district court also rejected Jimenez's argument that he was entitled to qualified immunity. (*Id.*,at 8-10;PageID#5519-5521). The district court noted that, although Jimenez briefly mentioned qualified immunity "in passing" during his oral Rule 50(a) motion, the Court did not address qualified immunity in its order denying that motion "because Defendant did not argue in support of his entitlement to immunity." (*Id.*,at 8;PageID#5519). The district court addressed the qualified

immunity issue, however, "because Defendant fully briefed the issue in the renewed motion," but ultimately rejected Jimenez's argument that he was entitled to qualified immunity. (*Id.*,at 9-10;PageID#5520-5521). In denying qualified immunity, the district court relied upon its prior holding that the withheld evidence undermined the State's theory of the case and would have impeached the prosecution's star witness and marred Jimenez's own credibility. (*Id.*;RE:178: Order, at 6-7;PageID#5137-5138).

Jimenez filed a notice of appeal on August 30, 2024. (RE.190:Notice of Appeal;PageID#5535-5536).

## SUMMARY OF THE ARGUMENT

There is no merit to defendant's argument that this Court lacks subject matter jurisdiction over this case. Defendant's attempt to invoke the *Heck* doctrine as a bar to this civil suit should be rejected by this Court.

Jimenez's procedural failure prevents this Court from considering Jimenez's qualified immunity defense. Because Jimenez failed to raise the issue of qualified immunity in his pre-verdict oral motion for judgment as a matter of law, he has waived this claim. *Sykes v. Anderson*, 625 F.3d 294, 304 (6th Cir.2010).

Even if this Court reaches the merits of Jimenez's qualified immunity defense, the district court properly denied defendant's renewed motion for judgment as a

matter of law on qualified immunity grounds in this §1983 action.

Finally, there is no merit to defendant's argument that he is entitled to a new trial based upon the rulings of the district court at trial. Defendant cannot establish that the district court abused its discretion in denying his motion for a new trial.

## ARGUMENT

### I.     STANDARD OF REVIEW

This Court reviews de novo the district court's denial of a renewed motion for judgment as a matter of law under Rule 50(b). *Sykes*, 625 F.3d at 305.

This Court reviews a district court's decision denying a motion for new trial for an abuse of discretion, and may reverse only if the Court has "a definite and firm conviction that the trial court committed a clear error of judgment." *Sykes*, 625 F.3d at 322.

### II.     THERE IS NO MERIT TO DEFENDANT'S ARGUMENT THAT THE DISTRICT COURT ERRED IN FAILING TO DISMISS THIS ACTION FOR LACK OF SUBJECT MATTER JURISDICTION.

Defendant opens his brief with the argument that this Court lacks subject matter jurisdiction over this case and attempts to invoke the doctrine of *Heck v. Humphrey*, 512 U.S. 477, 486 (1994), as a bar to this civil suit. (Defendant's Brief on Appeal, at 16-27). Under the *Heck* doctrine, a §1983 action cannot be maintained if

a favorable judgment would impugn the integrity of a conviction that was not already reversed, expunged, invalidated, or overturned. *Heck*, 512 U.S. at 487.

Defendant argues that the order vacating Mr. Ansari's convictions and sentences is invalid and insufficient to satisfy the "favorable termination" requirement of *Heck* because the order was entered based on a stipulation and not in response to a "motion" filed by either the defendant or the prosecution, supposedly in contravention of the Michigan Court Rules. (Defendant's Brief, at 19-27). Defendant argues that the stipulated order therefore constitutes an "ultra vires" act by the state court that was not expressly or impliedly mandated or authorized by law. (*Id.*, at 19). The defendant's argument is flawed for several reasons.

Defendant's argument is based on the fact that the state trial court issued an order pursuant to stipulation that vacated Mr. Ansari's convictions and sentences and dismissed all charges against him. (RE.75-1:Stipulated Order Vacating Conviction,PageID#1908-1909). That order, signed by Wayne County Circuit Judge Thomas M.J. Hathaway, indicates that the parties agreed that newly discovered evidence and the prosecuting attorney's office own investigation warrants relief from the conviction:

> This matter having been presented in open court through the stipulation of the parties, and the parties have agreed that newly discovered evidence, as well as the Wayne County Prosecutor's own investigation,

warrants relief, and the Court being otherwise fully advised in the premises of said stipulation;

IT IS HEREBY ORDERED that in the interest of justice, Alexandre Ansari's convictions and sentences in this matter are hereby vacated, and all related charges are hereby dismissed. Mr. Ansari shall be released from the Michigan Department of Corrections forthwith.

(RE.75-1:Stipulated Order Vacating Conviction,PageID#1908-1909).

Valerie Newman, the Director of the CIU, Carole Stanyar, the lead attorney in the CIU investigation, and two attorneys from the Federal Defender Office all stipulated to entry of the order vacating the conviction. (*Id.*).

The order vacating Mr. Ansari's conviction has never been reversed, vacated, set aside, or challenged on appeal, nor has any collateral attack on the order ever been mounted by any party in a state forum. It is well established that a federal court must afford the state court's final order of dismissal the same conclusive effect that would be given to it by the state courts. 28 U.S.C. § 1738; *Anderson v. City of Blue Ash*, 798 F.3d 338, 350 (6th Cir.2015) ("'State-court judgments are given the same preclusive effect under the doctrines of res judicata and collateral estoppel as they would receive in courts of the rendering state.'") (quoting *Ohio ex rel. Boggs v. City of Cleveland*, 655 F.3d 516, 519 (6th Cir. 2011)). Defendant has not cited any case law supporting his argument that such an order would not be regarded as fully final and given conclusive effect by Michigan courts.

Defendant contends, however, that the state court's order was procedurally deficient and should be disregarded because it was issued based on presentation of a "stipulation" rather than a "motion," in contravention of what defendant claims are the requirements under the Michigan Court Rules. (Defendant's Brief, at 19-21). Defendant, however, has not cited any legal authority for the proposition that this Court has any power to review or nullify the final order of a state court invalidating a criminal conviction. To the contrary, it is well settled that federal appellate courts generally have no authority to entertain appellate review of state court judgments, which is a prerogative exclusively reserved to the Supreme Court of the United States. See *Fowler v. Benson*, 924 F.3d 247, 254 (6th Cir. 2019) (holding that "*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), hold that only the Supreme Court may review judgments entered by state courts in civil litigation."); *Berry v. Schmitt*, 688 F.3d 290, 298 (6th Cir. 2012) (same, citing 28 U.S.C. §1257 and *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 (2005)).

The district court properly held that the court "will not determine whether the State followed its own procedure for vacating criminal convictions. Michigan vacated Defendant's conviction, which is enough to confer subject matter jurisdiction on this Court." (RE.189:Opinion, at 5;PageID#5516).

Contrary to defendant's argument that the state court's order vacating Mr. Ansari's conviction was an "ultra vires" act, the state court entered a valid order vacating Mr. Ansari's conviction and dismissing all criminal charges against him. "A state officer may be said to act ultra vires only when he acts without any authority whatever." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 736 (6th Cir. 2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)). "The test to determine whether a state official has acted ultra vires is whether the state official had a colorable basis for the exercise of authority." *Id*. See also *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949) (holding that an ultra vires claim rests on "the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient.").

It is undisputed that the Michigan Court Rules grant authority to state courts to vacate or set aside a criminal judgment after the conclusion of direct appeal under Michigan Court Rule 6.501, *et seq*. Defendant does not question the state court's authority to enter such an order, but merely claims an error in the "exercise" of that authority. *Larson*, 337 U.S. at 690. The state court's order vacating Mr. Ansari's convictions therefore cannot be said to be an "ultra vires act." *Id*.

Michigan courts readily recognize the fundamental distinction between errors in the exercise of valid jurisdiction and actions taken in the absence of jurisdiction to

act in the first instance. *Buczkowski v. Buczkowski*, 88 N.W.2d 416, 419 (Mich. 1958). There simply is no legal ground for defendant's argument that the act of a state trial court of general jurisdiction in vacating its own judgment was done "without any authority whatsoever," based upon procedural missteps that purportedly occurred before entry of the order vacating Mr. Ansari's conviction.

In any event, there is no support in the Michigan Court Rules for defendant's position that the order vacating Mr. Ansari's conviction was procedurally unsound. Rule 6.501 provides that "[u]nless otherwise specified by these rules, a judgment of conviction and sentence entered by the circuit court not subject to appellate review under subchapters 7.200 or 7.300 may be reviewed only in accordance with the provisions of this subchapter."  The commentary to Rule 6.501 indicates that the procedural hurdles established in that chapter of the Michigan Court Rules establish the right *of a defendant* to present a motion for relief from judgment. Rule 6.501 cmt. ("New Subchapter 6.500 establishes a procedure for postappeal proceedings challenging criminal convictions. It provides the exclusive means to challenge convictions in Michigan courts for a defendant who has had an appeal by right or by leave, who has unsuccessfully sought leave to appeal, or who is unable to file an application for leave to appeal to the Court of Appeals because 18 months have elapsed since the judgment."). Nothing in those provisions or elsewhere in the

Michigan Rules of Court constrains a state trial court's authority in the first instance to vacate or set aside its own judgment of conviction upon the initiation of the prosecuting attorney. Rule 6.501 *et seq*., rather, applies by its plain terms only to a request for relief by a criminal defendant.

Even assuming, however, that Rule 6.502 does not only apply to requests for relief by a criminal defendant, and in fact applies to a request for relief initiated by the prosecuting attorney, the court rule is clear that the trial court had the authority to act upon the stipulation of the attorneys. Rule 6.502(D) specifically provides that a state court may adjudicate even a nonconforming request for relief that is not submitted in the form outlined in the court rules:

> If a motion is not submitted on a form approved by the State Court Administrative Office, or does not substantially comply with the requirements of these rules, the court shall either direct that it be returned to the defendant with a statement of the reasons for its return, along with the appropriate form, *or adjudicate the motion under the provisions of these rules*....

Rule 6.502(D), therefore, authorizes the state court to adjudicate the request for relief, even when presented in a nonconforming manner such as a stipulated order.

For all of these reasons, defendant's jurisdictional argument should be rejected.

**III. THE DISTRICT COURT PROPERLY DENIED QUALIFIED IMMUNITY TO JIMENEZ BASED ON EVIDENCE THAT HE FAILED TO DISCLOSE EXCULPATORY EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*, 373 U.S. 83 (1963).**

Defendant Jimenez appeals the district court's denial of qualified immunity with respect to Mr. Ansari's assertion that Jimenez withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied qualified immunity to Jimenez based on evidence that he failed to disclose exculpatory evidence. For the reasons that follow, the district court's opinion denying qualified immunity to Jimenez on Mr. Ansari's *Brady* claim should be affirmed.

As an initial matter, Jimenez has waived his qualified immunity claim by failing to raise the matter in his Rule 50(a) motion prior to the district court's submission of the case to the jury. It is well established that a post-trial motion for judgment as a matter of law is not available on an issue not brought before the court prior to submission of the case to the jury. *Sykes*, 625 F.3d at 304.

In *Sykes*, the defendants moved orally for judgment as a matter of law under Rule 50(a) prior to the cases's submission to the jury, asserting only that the evidence was insufficient to prove that the defendants violated the plaintiffs' Fourth and Fourteenth Amendment rights. The defendants attempted to argue on appeal that their Rule 50(a) argument necessarily included a claim of qualified immunity because the

sufficiency of the evidence is "inextricably intertwined" with qualified immunity. This Court, however, rejected defendants' argument, holding that a pre-verdict motion and a post-verdict motion "must be similar enough to 'provid[e] notice to the court and opposing counsel of any deficiencies in the opposing party's case prior to sending it to the jury,' thereby fulfilling the stated purpose of the Rule." *Sykes*, 625 F.3d at 304, citing *Ford v. County of Grand Traverse*, 535 F.3d 483, 492 (6th Cir. 2008).

This Court held that defendants' oral Rule 50(a) motion failed to provide the required notice. *Sykes*, 625 F.3d at 304. This Court noted that the defendants never mentioned "qualified immunity" and never referenced "clearly established law" or "objectively unreasonable actions," which might have put the court and the plaintiffs on notice of the defendants' qualified immunity claim. *Id.*

This Court also held in *Sykes* that the fact that defendants raised their qualified immunity argument in their unsuccessful summary judgment motion did not change the waiver analysis. *Id.* This Court found that even when a defendant raises qualified immunity in a summary judgment motion, the issue is waived on appeal if not presented in a Rule 50(a) motion. *Id.* This Court therefore concluded that the defendants' failure to make a pre-verdict motion for judgment as a matter of law under Rule 50(a) on the grounds of qualified immunity precluded them from making

a post-verdict motion under Rule 50(b) on that ground. See also *Ayers v. City of Cleveland*, 773 F.3d 161, 167-168 (6th Cir. 2014) (declining to consider a qualified immunity defense on appeal under *Sykes* where the defendants failed to raise their defense in either a Rule 50(a) or Rule 50(b) motion).

As in *Sykes*, Jimenez here did not did not argue in support of his entitlement to qualified immunity in his oral motion for judgment as a matter of law. (RE.173:Tr.2/14/24,at 104-106;PageID#4876-4878). Counsel for Jimenez only mentioned qualified immunity in two very limited contexts. The first was in response to a question posed by the district court regarding a "novel" theory that the failure to turn over exculpatory evidence could change the outcome because it may influence a prosecutor's charging decision. (*Id.*,at 116-117;PageID#4888-1889). The only other context that qualified immunity was mentioned was in counsel's statement that other circuits have required "intentional" withholding of exculpatory evidence in order to bring a civil suit. (*Id.*,at 128-129;PageID#4900-4901).

Notably, in denying Jimenez's Rule 50(a) motion, the district court did not address qualified immunity. (RE.178:Order;PageID#5132-5139). In fact, the district court later recognized in its order denying Jimenez's renewed motion for judgment as a matter of law that, although Jimenez briefly mentioned qualified immunity "in passing" during the oral motion for judgment as a matter of law, the Court did not

address qualified immunity in its order denying the oral motion "because Defendant did not argue in support of his entitlement to immunity." (RE.189:Opinion,at 8;PageID#5519).

Pursuant to this Court's holding in *Sykes*, Jimenez has therefore waived the issue of qualified immunity because he failed to raise the issue in his oral motion for judgment as a matter of law.

Even if this Court were to find that Jimenez has not waived his qualified immunity claim, this Court should affirm the district court's denial of qualified immunity to Jimenez on the merits. In reviewing a claim for qualified immunity, this Court follows a two-step inquiry. First, the Court must consider whether the plaintiff has asserted a violation of a known constitutional right. Second, the Court must consider whether the constitutional right was so clearly established at the time in question that a reasonable official in the defendant's position would have known that he was violating the plaintiff's constitutional rights. *Gregory v. City of Louisville*, 444 F.3d 725, 745 (6th Cir. 2006).

Defendant first argues that the Supreme Court has "strongly suggested" that a clearly established right must be based solely on Supreme Court precedent and cannot be based on circuit precedent. (Defendant's Brief, at 29-31). Defendant requests that this Court adopt this stricter standard and hold that there was no clearly established

Supreme Court precedent that required a police officer to disclose information that, according to defendant, amounts to "uncorroborated rumors or anonymous tips" under *Brady*.

The difficulty with this argument, however, is that there is no authority requiring application of the strict standard defendant advocates here. Jimenez admittedly indicates that his argument is based on statements made by the Supreme Court that merely "suggest" or "imply" such a standard. (Defendant's Brief, at 29-30). Defendant's argument, however, fails to account for Supreme Court precedent holding that a right can be clearly established based not only on Supreme Court precedent, but also based on "cases of controlling authority in their jurisdiction at the time of the incident with clearly established the rule on which they seek to rely" as well as "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

In fact, Jimenez recognizes the Supreme Court's holding in *Wilson* later in his brief, stating that "[a]t a minimum, to defeat qualified immunity there must have been in 2013 a Supreme Court decision, a Sixth Circuit decision, or "a robust 'consensus of cases of persuasive authority.'" (Defendant's Brief, at 32). Defendant cites to the Supreme Court's decision in *Wilson* for this proposition. Given the lack of authority

for defendant's argument that clearly established law must be based on Supreme Court opinions only, this Court should continue to apply the precedent set forth in *Wilson*.

Jimenez additionally argues that, even under Sixth Circuit precedent, he did not violate a clearly established right. (Defendant's Brief, at 31). This argument, however, should be rejected on the merits. As recognized by the district court, this Court's in *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) held that a police officer's obligation to turn over exculpatory evidence under *Brady* was clearly established prior to 1990. (RE.70:Opinion,at 17-18;PageID#1828-1829).

In *Moldowan*, the plaintiff filed a §1983 claim alleging a number of violations of his constitutional rights arising out of his 1990-1991 criminal prosecution and conviction, a conviction that was ultimately overturned in 2002. The plaintiff alleged in pertinent part that a City of Warren police detective, Donald Ingles, failed to disclose exculpatory evidence in violation of his constitutional rights. *Moldowan*, 578 F.3d at 376. Ingles appealed the district court's denial of his motion for summary judgment, arguing on appeal that plaintiff "cannot demonstrate that the Due Process Clause imposes on the police a clearly established obligation to disclose exculpatory information." *Id.*, at 377.

This Court confirmed that the due process guarantees recognized in *Brady* as

applicable to a prosecutor also imposed "an analogous or derivative obligation on the police" to disclose potentially exculpatory evidence. *Moldowan*, 578 F.3d at 378-381. After determining that such an obligation exists under *Brady*, this Court in *Moldowan* determined that this obligation was "clearly established" as of the date of Detective Ingles' alleged violation of that duty in August 1990. *Id.*, at 382.

Given this Court's holding in *Moldowan*, the district court properly held that it was clearly established at the time of the events in question that Mr. Ansari had a right to not have exculpatory or impeachment evidence withheld from him. (RE.70:Opinion,at 17-18,PageID#1828-1829). As held in *Moldowan*, it was well established long before 2012, when Mr. Ansari was prosecuted, that the duty to disclose evidence falls on the state as a whole, and applies to police as well as prosecutors. *Moldowan*, 578 F.3d at 382.

The testimony of Jimenez further supports that a police officer's obligation under *Brady* was clearly established in 2012. Jimenez admitted at trial that his obligation under *Brady* required him to disclose exculpatory and impeachment evidence to the prosecutor. (RE.170:Tr.2/9/24,at 78-81;PageID#4234-4237). He conceded that this obligation extends to include evidence that is not in recorded form as well as evidence that would show that key witnesses were lying or that would otherwise counter the prosecution's theory of the case. (*Id.*).

Jimenez admitted that he received information from a confidential source regarding Sandoval's background and that the shooting was a "hit" orchestrated by Sandoval because of the theft of heroin by Figueroa and Barley. (*Id.*,at 80-87, 97-108;PageID#4236-4243,4253-4264). He acknowledged that the Sandoval information he received from his source was important because it gave motive and context to the murder and countered the prosecutor's statements to the jury that this was a random act. (*Id.*, at 97-108, 116-118; PageID#4253-4264,4272-4274). He also admitted that he obtained a tip from the FBI identifying "Solo" as the shooter. (*Id.*,at 138-141;PageID#4294-4297).

Jiminez also conceded that *all* of this information should have been turned over to the prosecutor. (*Id.*, at 116-118, 139-141;PageID#4272-4274, 4295-4297). In fact, he testified that he fulfilled his obligation to provide the Sandoval information to the prosecuting attorney because he informed the prosecutor of all of the information he obtained regarding Sandoval, including the cell phone data showing no connection between Mr. Ansari and Sandoval, Sandoval's GPS information, and the tips received from various sources. (RE.170:Tr.2/9/24, at 117-118,147,150-155;PageID#4273-4274,4303,4306-4311;RE.171:Tr.2/12/24,at 25-26,53-55,60-62,74-75;PageID#4412-4413,4440-4442,4447-4449,4461-4462).

Given this testimony, the district court properly found that it was clearly

established as of 2012 that it was the obligation of police to disclose exculpatory evidence.

Jimenez also argues that Mr. Ansari failed to demonstrate clearly established law holding that, "in the particular circumstances" here, a police offer's failure to disclose "motive" evidence and purportedly "uncorroborated rumors and anonymous tips" that was not "exculpatory or impeaching" violates *Brady*. (Defendant's Brief, at 32-33,37-47). Here, however, the facts as established by the record below constitute a violation of clearly established law. As the trial evidence demonstrated, and as the district court repeatedly recognized, the Sandoval evidence significantly undermined the prosecutor's theory of the case, which was that there was no motive for the shooting and that it was a random act. (RE.189:Opinion,at 9-10;PageID#5520-5521;RE:178:Order,at 6-7;PageID#5137-5138;RE.70:Opinion,at 15-16;PageID#1826-1827).

Additionally, the withheld Sandoval evidence would have impeached the testimony of the prosecution's witnesses with respect to their drug connections to Sandoval, a major drug dealer in Michigan, and would have marred Jimenez's credibility and questioned his murder investigation. (*Id.*). As noted by the district court, this evidence likely would have changed the outcome here given that the evidence against Mr. Ansari was not strong and turned solely on eyewitness

identification. (*Id.*). And as noted above, Jimenez *admitted* at trial that the evidence was important and needed to be turned over to the prosecutor because it gave motive and context to the murder and countered the prosecutor's statement to the jury that this was a random act. (RE.170:Tr.2/9/24,at 97-108,116-118;139-141,PageID#4253-4264, 4272-4274,4295-4297).

In withholding this evidence, Jimenez "cannot seriously contend that a reasonable [investigator] would not know that such actions were inappropriate and performed in violation of an individual's constitutional...rights." *Gregory*, 444 F.3d at 744, citing *Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir. 1999). Contrary to defendant's argument on appeal, the evidence established that it was "clearly established" in 2012 that a police officer had to turn over this information to the prosecutor. *Moldowan*, *supra*.

Jimenez also contends, as he repeatedly did in the district court, that Mr. Ansari failed to establish a *Brady* violation because the withheld evidence was not material. (Defendant's Brief, at 33-36). To sustain a *Brady* claim based on withheld evidence, a plaintiff must show (1) the government withheld evidence "either willfully or inadvertently," (2) the evidence favored the plaintiff, either because it is exculpatory or because it is impeaching, and (3) the evidence was material such that its nondisclosure prejudiced the plaintiff. *Jackson v. City of Cleveland*, 925 F.3d 793,

814 (6th Cir. 2019), citing *Stickler v. Greene*, 527 U.S. 263, 281-282 (1999). Here, Mr. Ansari established that the evidence withheld by Jimenez was material and would have made a difference in the criminal proceedings.

As recognized by the district court, Mr. Ansari produced evidence at trial that Jimenez received information from a confidential source regarding Sandoval's background as a major drug dealer in Michigan and that the shooting was a "hit" orchestrated by Sandoval because of the theft of heroin by Figueroa and Barley. Although Jimenez believed that Mr. Ansari was responsible for the shooting, he acknowledged that he received Sandoval's cell phone data, which showed no connection between Mr. Ansari and Sandoval. Jimenez also received the GPS tracking information from Sandoval's vehicles, which revealed that Sandoval was in the immediate area of the September 22 shootings. Jimenez acknowledged at trial that the Sandoval information was material and had to be turned over to the prosecution because it gave motive and context to the murder and countered the prosecutor's statement to the jury that this was a random act. Although Jimenez testified at trial that he disclosed all of this information to the prosecutor, Ms. Tusar, she testified that Jimenez did not disclose this information to her during the Cuevas murder trial.

The district court properly concluded that the Sandoval evidence was material because it undermined the prosecutor's theory of the case and would have impeached

the star witnesses and "crushed" their credibility. (RE.70:Opinion,at 15-16;PageID#1826-1827;RE.178:Order, at 6;PageID#5137;RE.189:Opinion,at 6-7;PageID#5517-5518). In fact, Ms. Tusar testified that the Sandoval information should have been provided to her and that the evidence was significant both because it was contrary to her theory of the case that there was no motive for the Cuevas murder and because it would have countered the credibility of Barley and Figueroa. As recognized by this Court in *Sykes*, testimony from a prosecuting attorney that he or she would have disclosed certain evidence had he or she known about it "implicitly recognizes its value as *Brady* material." 625 F.3d at 321.

Additionally, Mr. Ansari's criminal defense expert Todd Perkins testified before the jury about what a criminal defense attorney would do differently had the attorney known of the Sandoval evidence. He opined that the failure to produce this exculpatory evidence prejudiced Mr. Ansari's defense in his criminal trial by affecting his ability to impeach the testimony of Jimenez, Figueroa, and Barley and create doubt upon the identification of him as the shooter. (RE.169:Perkins,Tr.2/8/24,at 71-74,89, 112-115,121-122,132-133;PageID#4004-4007,4022,4045-4048,4054-4055,4065-4066).

As recognized by the district court, the evidence against Mr. Ansari in the criminal case was not strong and relied upon an eyewitness identification of Mr.

Ansari by two witnesses who had drug ties with Sandoval, the person actually behind the shooting. The withheld evidence, however, undermined the prosecutor's case against Mr. Ansari as the shooter where he had no connection to Sandoval. For all of these reasons, this Court should affirm the judgment of the district court.

## IV. THE DISTRICT COURT PROPERLY DENIED DEFENDANT'S MOTION FOR NEW TRIAL.

Jimenez also appeals from the district court's denial of his motion for new trial. (Defendant's Brief, at 48-68). For the reasons that follow, this Court should deny defendants' request for a new trial where the district court did not abuse its discretion.

### A. Wayne County Prosecutor's Subpoenaed Office File.

Before Jimenez rested his case in chief, the district court heard arguments regarding the admissibility of the prosecutor's subpoenaed case file from the Cuevas case. (RE.173:Tr.2/14/24,at 85-104;PageID#4857-4876). Jimenez sought to admit as an exhibit the subpoenaed case file from the prosecutor's office, which numbered 911 pages, to demonstrate that Jimenez turned over "everything that he purports to have turned over back in 2012." (*Id.*,at 87;PageID#4859). Jimenez indicated that the prosecutor's subpoenaed file contains the documents that Ms. Tusar testified she did not have when she was prosecuting Mr. Ansari in the Cuevas case, and argued that the jury had a right to review the file to determine whether Ms. Tusar or Jimenez were

telling the truth. (*Id.*,at 87,93-95;PageID#4859,4865-4867). Jimenez admitted, however, that the prosecutor's subpoenaed file contained documents from the Cuevas murder case, the Edwards murder case, and the Sandoval domestic violence case. Jimenez conceded there was no way to determine when the documents were placed in the file or at what point he turned the information over to the prosecutor's office. (*Id.*,at 93-95;PageID#4865-4867).

Mr. Ansari argued that, barring any evidence regarding what the prosecutor's file looked like in September 2013 when he was convicted in the Cuevas case, the subpoenaed file was irrelevant to the question of what *Brady* evidence was disclosed to the prosecutor's office. Mr. Ansari also argued that because the subpoenaed file contains documents from three files – the Cuevas murder case, the Edwards murder case, and the Sandoval domestic violence case – admission of the evidence would lead to juror confusion. (*Id.*,at 90, 95-97, 101-102;PageID#4862, 4867-4869).

The district court took the issue under advisement but noted that there was a "definite issue of fact as to what Jimenez turned over" to the prosecutor's office. (*Id.*, at 98,102-104;PageID#4870,4874-4876).

The district court issued its ruling on the admission of the subpoenaed copy of the prosecutor's office file via order issued on February 15, 2024. (RE.159:Amended Order;PageID#3739-3740;RE.174:Tr.2/15/24,at 5-6;PageID#4970-4971). The district

court declined to admit the file into evidence, holding that its potential probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and needlessly presenting cumulative evidence. (*Id.*). Although the district court declined to admit the file into evidence, it held that "the parties may present arguments and inferences they wish jurors to make about the file." (*Id.*). The district court also agreed to instruct the jury that it was undisputed that Wayne County provided a 911-page file to Jimenez prior to trial in this case in response to a request from the defendant. (RE.174:Tr.2/15/24,at 11-12;PageID#4976-4977).

Immediately after the defense rested, the district court provided a statement to the jury regarding the prosecutor's subpoenaed file:

> Now, there is one outstanding issue that I'd like to advise you of, and that is that this morning here the parties agreed that the defendant, Mr. Jimenez, requested through proper legal means a file from the Wayne County Prosecutor's Office. I think you heard that referenced in the -- in the testimony of Ms. Tusar. The County did, in fact, provide a 911-page file to the defendant pursuant to that proper request, and I believe that was in late 2020, around November, and so you should take that fact as being proven. Both sides have agreed on it, I'm telling you about it, and -- and it's something that you can be considered -- that you consider. As I will instruct you, the evidence that you consider is within your bailiwick, not mine or anybody else's. But that's a fact that everybody's agreed on here.

(RE.174:Tr.2/15/24,at 15-16;PageID#4980-4981).

Jimenez argued in his motion for new trial that the district court erred in

excluding the Wayne County Prosecutor's Office file. (RE.180:New Trial Motion;PageID#5143-5177). In denying the motion for new trial, the court incorporated its prior order denying the admissibility of the subpoenaed file and maintained that any potential probative value of the evidence was "substantially outweighed by the danger of unfair prejudice, confusing the issues, and needlessly presenting cumulative evidence." (*Id.*,at 10-12;PageID#5521-5523). The court held:

> In his motion for a new trial, Defendant argued that the file should have been admitted as self-authenticating under Federal Rule of Evidence 902(11) and that Defendant was not offering anything in the file for the truth of the matter asserted so its contents cleared the hearsay hurdle. ECF 180, PgID 5159–5162. But Defendant ignored the basis for the Court's evidentiary ruling. Authentication and hearsay were not barriers to admissibility. *See* ECF 158. Unfair prejudice under Rule 403 was the basis for the Court's ruling. *Id.* Indeed, for the same reasons that admissibility would have been confusing at best and unfairly prejudicial at worst, there is no reason to believe that the file, if admitted, would have helped Defendant. The file contained 911 pages. Its contents were not contextualized, summarized, or organized by any witness during trial. Prosecutor Erika Tusar testified that she did not know the contents of the file, who had access to the file at what time, or when documents were placed in the file. **And Defendant did not allege that there was a smoking gun in the file that proved Erika Tusar knew about the exonerating evidence *before* Plaintiff's criminal trial.** The file only showed—and Prosecutor Tusar did not deny—that she became aware of the aforementioned evidence at some point. And the Court specifically instructed Defendant to present such evidence. ECF 157, PgID 3734–35 ("[T]o the extent the parties disagree about the timing and substance of the file's contents, the parties should be prepared to call and question witnesses who can attest to the substantive content of the file."). The Court's decision to not admit the WCPO file was correct and does not warrant a new trial.

(*Id.*, at 11-12; PageID#5522-5523) (emphasis added).

Jimenez now argues on appeal that the district court abused its discretion in excluding the Wayne County Prosecutor's subpoenaed office file. The district court, however, did not commit a clear error of judgment in precluding this evidence at trial. *Sykes*, 625 F.3d at 322.

Evidence is relevant and admissible if it has the "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Rule 403 of the Federal Rules of Evidence states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The district court has broad discretion in balancing probative value against potential prejudicial impact. *United States v. Feinman*, 930 F.2d 495, 499 (6th Cir. 1991).

It is well established that the exclusion of evidence is within the sound discretion of the trial court, and the court's discretion will not be disturbed on appeal unless the reviewing court finds that the ruling excluding the evidence is not only erroneous but results in substantial injustice to the aggrieved party. *Zamlen v. City of Cleveland*, 906 F.2d 209, 215-216 (6th Cir. 1990).

In denying Jimenez's motion for new trial, the district court maintained its conclusion that any potential probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confusing the issues, and needlessly presenting cumulative evidence. (RE.189:Opinion,at 10-12;PageID#5521-5523). The district court's conclusion does not amount to an abuse of discretion.

As noted by the district court, the subpoenaed file contained 911 pages of materials. Jimenez sought to admit the subpoenaed file as an exhibit in order to demonstrate that Jimenez turned over "everything that he purports to have turned over back in 2012." (RE.173:Tr.2/14/24,at 87;PageID#4859). Jimenez admitted, however, that the subpoenaed file contains documents from the Cuevas murder case, the Edwards murder case, and the Sandoval domestic violence case and conceded that there was no way to determine when the documents were placed in the file or at what point Jimenez turned the information over to the prosecutor's office. (*Id.*,at 93-95;PageID#4865-4867).

Given Jimenez's admissions that there was no way to determine when the documents were placed in the file or when Jimenez disclosed the information contained in the file to the prosecutor, the district court did not err in concluding that the probative value of the evidence was outweighed by the danger of unfair prejudice. The district court's ruling was designed to avoid the danger that the jury would

review the subpoenaed file and presume that any exculpatory evidence contained within the subpoenaed file was disclosed to Mr. Ansari prior to his 2012 criminal trial. Any such presumption, however, would be contrary to Jimenez's admission that it was unknown when the evidence was actually included in the file. Because there was no evidence that the subpoenaed file contained the same information as the prosecutor's file as it existed in 2012, the district court did not abuse its discretion in declining to admit the evidence at trial.

Additionally, as noted by the district court, there is no claim by Jimenez that the subpoenaed file contained a "smoking gun" that proved Ms. Tusar knew of the *Brady* evidence before Mr. Ansari's criminal trial. The subpoenaed file merely showed that Ms. Tusar was aware of the Sandoval information at some point.

Not only is the district court's decision not erroneous, but the court's decision did not result in substantial injustice to Jimenez. The district court made clear that Jimenez was not precluded from presenting arguments and inferences he wished the jurors to make about the file. (RE.159:Amended Order; PageID#3739-3740;RE.174:Tr.2/15/24,at 5-6;PageID#4970-4971). The district court also instructed the jury that it was undisputed that Wayne County provided a 911-page file to Jimenez prior to trial in this case in response to a request from the defendant. (RE.174:Tr.2/15/24,at 11-12,15-16;PageID#4976-4977,4980-4981).

Based on these facts, the district court did not abuse its discretion in excluding this evidence at trial.

### B.    Tusar Memo.

Jimenez argues on appeal that the district court erred in failing to admit the Tusar Memo in its entirety. The district court's ruling in this regard does not constitute an abuse of discretion.

As noted above, the district court has broad discretion in balancing the probative value of relevant evidence against potential prejudicial impact, *Feinman*, 930 F.2d at 499, and the exclusion of evidence is within the sound discretion of the trial court and will not be reversed unless the ruling excluding the evidence is erroneous and results in substantial injustice to the aggrieved party. *Zamlen*, 906 F.2d at 215-216.

Here, the district court recognized that the Tusar memo contained both (1) highly relevant information that is probative of whether Tusar knew of the allegedly withheld *Brady* evidence regarding Sandoval, and (2) irrelevant information about the murder cases and criminal investigations "that are highly prejudicial and not at issue in the present trial." (RE.130:Opinion,at 6;PageID#2929). In its exercise of discretion, the district court excluded those portions of the Tusar Memo that it found were irrelevant and highly prejudicial in this case. (*Id.*).

Despite the district court's redaction of the irrelevant and highly prejudicial aspects of the Tusar Memo, Jiminez was able to use the Tusar Memo in furtherance of his defense that Ms. Tusar was aware of the *Brady* evidence regarding Sandoval. Jimenez cross examined Ms. Tusar with her memorandum in an attempt to demonstrate that Ms. Tusar was in fact aware of the *Brady* evidence. Importantly, Jimenez was able to cross examine Ms. Tusar regarding the information contained in the *unredacted* memorandum in order to obtain her testimony that the memorandum contained information regarding the Cuevas murder. Jimenez pursued this line of questioning in order to bolster his defense that Jimenez did in fact advise Ms. Tusar of the Sandoval evidence during the Cuevas murder trial, which was contrary to Ms. Tusar's testimony that he did not.

Jimenez argues on appeal, as he argued in the district court, that the Rule of Completeness, Federal Rule of Evidence 106, dictates that the entirety of the Tusar Memo should have been admitted. (RE.180:New Trial Motion;PageID#5143-5177). In denying defendant's motion for new trial, the district court properly held that defendant's reliance on the Rule of Completeness did *not* supersede the Rule of Relevance, Rule 403:

> Defendant relied on the Rule of Completeness, Federal Rule of Evidence 106, to argue that the Court should have admitted the entire Tusar memo, unredacted. ECF 180, PgID 5175. But the Rule permits—and

does not require or guarantee—the introduction of "any other statement [] **that in fairness** ought to be considered at the same time" as the objected-to evidence. Fed. R. Evidence. 106 (emphasis added). The Rule does not supersede Rule 403. *United States v. Dotson*, 715 F.3d 576, 582 (6th Cir. 2013). And the Court explained on many occasions that evidence of other criminal investigations involving Plaintiff were more prejudicial than probative. *See, e.g.*, ECF 130, PgID 2929. The Court did not err by admitting only part of the Tusar memo. The Court will not grant a new trial on that basis.

(RE.189:Opinion,at 22-23;PageID#5533-5534) (emphasis in original).

As noted above, Jimenez was able to cross examine Ms. Tusar with her memorandum, including the unredacted portions of the memorandum, in order to demonstrate that Jimenez advised Ms. Tusar of the *Brady* evidence during the Cuevas murder trial. The district court's ruling, therefore, exhibits a proper exercise of the court's discretion to balance the probative value of relevant evidence against potential prejudicial impact, *Feinman*, 930 F.2d at 499. Defendant's request for a new trial on this ground should be denied.

## C.     Verdict Form.

The parties submitted a proposed verdict form prior to trial, which included various objections made by both parties. (RE.153:Proposed Jury Instructions/Verdict Form;PageID#3658-3718). Prior to the close of proofs, the parties argued their objections to the verdict form before the district court. (RE.173:Tr.2/14/24,at 147-189;PageID#4919-4961).

Mr. Ansari objected to the proposed verdict form on grounds that Question 1 on the verdict form should read, "Did Defendant, Moises Jimenez, violate Plaintiff, Alexandre Ansari's, Fourteenth Amendment right to due process" and should exclude the language "by withholding exculpatory evidence from the prosecutor" as proposed by Jimenez. (*Id.*,at 176;PageID#4948;RE.153:Proposed Verdict Form, at 60;PageID#3718). Mr. Ansari argued that the jury instructions sufficiently explained to the jury the claim he is bringing against Jimenez and his claim does not need to be explained further on the verdict form. (*Id.*).

Jimenez argued, however, that the additional language was needed to prevent the jury from rendering a verdict based upon an improper investigation by Jimenez rather than a failure to disclose exculpatory evidence. (RE.173:Tr.2/14/24,at 175-177;PageID#4947-4949). The district court ultimately submitted to the jury to a verdict form that did not include the additional language proposed by Jimenez. (RE.162:Verdict Form;PageID#3743-3744).

Jimenez argued in his motion for new trial that the district court erred in preventing defendant from presenting his proffered verdict form to the jury. (RE.180:New Trial Motion;PageID#5143-5177). In denying the motion for new trial, the district court rejected the defendant's contention that the verdict form provided to the jury allowed the jury to consider imposing liability based merely on Jimenez's

investigatory failures rather than by withholding exculpatory evidence from the prosecutor. (RE.189:Opinion,at 12-13;PageID#5523-5524). The district court reasoned that the verdict form specified that the jury needed to find that Jimenez violated Mr. Ansari's Fourteenth Amended right, which appropriately specified the finding the jury was charged to make. (*Id.*).

Jimenez argues on appeal that a new trial is proper because the district court declined to utilize his proposed language in Question 1 of the verdict form, which he claims constitutes prejudicial error.

It is well established that this Court treats verdict forms as part of the jury instructions. *Moody v. United States*, 958 F.3d 485, 491 (6th Cir. 2020). This Court therefore must consider the verdict form and the instructions together. *Armisted v. State Farm Mut. Auto. Ins. Co.*, 675 F.3d 989, 997 (6th Cir. 2012).

As part of the final instructions provided to the jury, the district court provided instructions on the elements of Mr. Ansari's claim. The district court instructed the jury that it was Mr. Ansari claim that Jiminez violated his 14th Amendment right to due process of law by withholding exculpatory and/or impeachment evidence in plaintiff's criminal trial. (RE.174: Tr.2/15/24,at 120-122;PageID#5085-5087). The district court also instructed the jury that Mr. Ansari must prove the elements of his claim by a preponderance of the evidence. (*Id.*).

The jury instructions therefore left no doubt that Mr. Ansari must prove by a preponderance of the evidence that Jimenez violated his Fourteenth Amendment right to due process of law by withholding exculpatory and/or impeachment evidence in plaintiff's criminal trial. (RE.174:Tr.2/15/24,at 120-122;PageID#5085-5087). And this Court must presume that the jury followed these instructions. *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 574 (6th Cir. 2019). The district court did not abuse its discretion in denying Jimenez's motion for a new trial on this ground.

While Jimenez argues that Mr. Ansari's counsel repeatedly questioned witnesses and made arguments during closing arguments about Jimenez's purportedly inadequate investigation, Jimenez fails to acknowledge two important points. First, it bears noting that many of the references to the lower court record reveal that there were no objections made to the statements of and/or questions asked by counsel for Mr. Ansari. More importantly, though, Jimenez fails to acknowledge the fact that the jury also was instructed regarding what it could consider as evidence and was specifically instructed that questions and statements of an attorney are *not* evidence. (RE.174:Tr.2/15/24,at 123-124;PageID#5088-5089). Jimenez's argument that the additional language in Question 1 was necessary here to counter counsel's purportedly improper statements at trial is therefore contrary to the general rule that a jury is presumed to follow its instructions. *Hubbell*, 933 F.3d at 574. There is no

58

basis for any assumption by Jimenez that the jury did not follow the instructions provided by the district court.

### D. Jury Instruction Regarding Attorney/Witness Communication.

The parties submitted proposed jury instructions and their objections to the proposed instructions prior to trial. (RE.153:Proposed Jury Instructions;PageID#3658-3718). Before the close of proofs, the parties argued their objections to the proposed instructions. (RE.173:Tr.2/14/24,at 147-189;PageID#4919-4961).

One issue that arose was with respect to the standard jury instruction regarding a witness who has been interviewed by an attorney. (*Id.*, at 178-180,182-188;PageID#4950-4952,4954-4960). Although the parties initially stipulated to the standard jury instruction, the parties revisited the propriety of giving the instruction because of testimony offered by Ms. Tusar.

Ms. Tusar testified during trial that she was contacted by counsel for Jimenez after she provided a deposition in this case, and advised that she perjured herself at her deposition.(RE.171:Tusar,Tr.2/12/24,at 162-166;PageID#4549-4553). Ms. Tusar testified that she was "shocked" that she received the call from Jimenez's counsel because she was represented by counsel at the time. (*Id.*,at 166;PageID#4553).

Jimenez argued that the court should give the standard jury instruction to demonstrate to the jury that it was appropriate for his counsel to contact Ms. Tusar during the course of this litigation. (RE.173:Tr.2/14/24,at 178-180,182-188;PageID#4950-4952,4954-4960). Mr. Ansari argued, however, that the instruction either should not be given or should be modified to include a paragraph indicating that an attorney may not contact a witness who is represented by counsel, as Ms. Tusar was when she was contacted by counsel for Jimenez. (*Id.*). The district court took the issue under advisement. (*Id.*,at 185,191;PageID#4957,4963).

The district court ruled that it would decline to give the standard jury instruction regarding a witness who has been interviewed by an attorney. (RE.174:Tr.2/15/24,at 7-8;PageID#4972-4973). The district court indicated, however, that Mr. Ansari was not allowed to argue or make statements regarding the content of the conversation between counsel for Jimenez and Ms. Tusar because, in the court's view, "it's completely extraneous and ultra vires to the issues in the case." (*Id.*,at 8-9;PageID#4973-4974). The district court also stated that it would give the standard jury instruction on credibility, stating that "the jury has an understanding of what [Tusar's] credibility is and how that episode might have affected it." (*Id.*,at 8;PageID#4973).

The district court thereafter provided the parties with copies of the final jury

instructions, and stated that all objections previously made to the instructions were preserved. (*Id.*,at 9-10;PageID#4974-4975;RE.164:Jury Instructions;PageID#3747-3774).

Jimenez argued in his motion for new trial that the district court erred in failing to instruct the jury that attorney contact with witnesses is not improper. (RE.180:New Trial Motion;PageID#5143-5177). The district court denied Jimenez's motion for new trial and rejected the defendant's argument that it erred in failing to provide the standard jury instruction regarding attorney/witness communications. (RE.189:Opinion,at 13-14;PageID#5524-5525). The district court reasoned that its rulings properly prevented the parties from injecting into the case "irrelevant and unsavory" arguments about lawyer professionalism:

> [T]he parties disagreed about whether the instruction should be given and whether it should be accompanied by instructions on other Michigan professional conduct rules regarding lawyer communications with represented persons. ECF 173, PgID 4950–52; 4956. Because the conduct of the lawyers in the case was mixed between effective advocacy and needlessly unprofessional bickering and because the Court wanted the jury to focus on the credibility of witnesses, not the attorneys, the Court declined to give any instruction regarding attorney-witness contact. *See id.* at 4957–59; ECF 174, PgID 4972–74. The Court also ordered Plaintiff's counsel not to "tak[e] potshots or mak[e] statements about Krystal Crittendon's phone call with [Erika] Tusar." ECF 174, PgID 4972–74. Those rulings were not in error. Rather, it saved the jury from hearing irrelevant and unsavory arguments about lawyer professionalism.

(RE.189:Opinion,at 13-14;PageID#5524-5525).

Jimenez now argues on appeal that the district court abused its discretion in failing to give his requested jury instruction.

It is well established that the district court has broad discretion in determining whether to give a requested instruction. *Gunter*, 551 F.3d at 484. "A district court's refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law; (2) not substantially covered by the charge actually delivered to the jury; and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *Id.* For the reasons that follow, the district court did not abuse its discretion in declining to give the instruction regarding attorney contact with witnesses.

Jimenez cannot establish here that the jury instruction addressing attorney/witness communication concerns a point so important in the trial that the failure to give the instruction substantially impaired his defense. *Gunter*, 551 F.3d at 484. As properly held by district court, the jury instruction on attorney/witness community was only germane to the question of the propriety of Jimenez's counsel's contact with a witness who was represented by counsel. This question, however, was not a relevant issue in the case.

Additionally, although the district court declined to give the requested

instruction, the district court took other steps to prevent the parties from injecting into the case irrelevant "and unsavory" arguments about lawyer professionalism. The district court advised Mr. Ansari's counsel that he was not allowed to argue or make statements regarding the content of the conversation between counsel for Jimenez and Ms. Tusar because, in the court's view, "it's completely extraneous and ultra vires to the issues in the case." (RE.174:Tr.2/15/24,at 8-9;PageID#4973-4974). The district court also ruled that it would give the standard jury instruction on credibility, stating that "the jury has an understanding of what [Tusar's] credibility is and how that episode might have affected it." (*Id.*,at 8;PageID#4973).

Given these facts, the district court did not abuse its discretion in declining to give the requested instruction.

## E. Improper Conduct During Closing Arguments.

Jimenez's final argument is that a new trial should be granted due to the improper conduct by counsel for Mr. Ansari during closing arguments.

When a party moves for a new trial based on allegedly improper comments made by counsel, this Court analyzes "the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g. whether it is a close case), and the verdict itself." *Balsley*

*v. LFP, Inc.*, 691 F.3d 747, 761 (6ᵗʰ Cir.2012). If the Court determines that counsel

made improper comments, this Court may set aside the verdict "only if there is a

reasonable probability that the verdict of the jury has been influenced by such

conduct." *Id.* The failure to object to the allegedly prejudicial comments at trial raises

the degree of prejudice that must be demonstrated in order to obtain a new trial on

appeal. *Id.*, at 761-762.

Jimenez argued in his motion for new trial, as he argues on appeal, that the

district court erred in permitting improper argument by counsel for Mr. Ansari during

closing arguments, when counsel (1) showed photographs of headstones in Arlington

National Cemetery, (2) referenced soldiers who fought and died to protect

constitutional rights, (3) referenced his veteran father, (4) displayed a folded

American flag to the jury, and (5) spoke about his police officer son. (RE.180:New

Trial Motion;PageID#5143-5177). Counsel also argues on appeal that counsel for Mr.

Ansari made additional improper "Golden Rule" comments during closing arguments

and improperly argued that Jimenez failed to properly investigate the Cuevas murder.

(Defendant's Brief, at 65-67). Notably, both the "Golden Rule" comments and the

comments regarding Jimenez's investigation of Mr. Ansari identified by defendant

on appeal were not objected to by defendant's counsel. (RE.174:Tr.2/15/24,at 48,

108;PageID#5013,5073).

The district court denied the motion for new trial, holding that the statements made by Mr. Ansari's counsel were not unfairly prejudicial but rather "were anecdotes to pursuasively frame the constitutional issue in Plaintiff's favor." (RE.189:Opinion,at 17-19;PageID#5528-5530). The district court also held that any risk of prejudice was mitigated by the court's jury instructions, which instructed the jury to based its verdict on the evidence only and specifically clarified that "[s]tatements, arguments and questions of the lawyers for the parties in this case" are not evidence. (*Id.*). The district court also found that the verdict itself weighed against a finding that a "reasonable probability" exists that the jury's verdict was influenced by improper attorney conduct:

> Moreover, "the verdict itself" weighed against a finding that a "reasonable probability that the verdict of a jury has been influenced by improper conduct" exists. *Cleveland*, 624 F.2d at 756. Plaintiff's counsel asked for $26,195,000 in compensatory damages, ECF 174, PgID 5013, and an equal amount, $26,195,000, in punitive damages, *id.* at 5015. The jury awarded $10,000,000 in compensatory damages and, notably, no punitive damages. ECF 162, PgID 3744. Plaintiff's alleged prejudicial arguments failed to inflame the punitive passions of the jury and garner an unreasonably large award.

> (RE.189:Opinion,at 19;PageID#5530).

As the district court properly held, defendant has failed to establish a "reasonable probability" that the verdict of the jury was influenced by the purportedly improper comments of counsel. Defendant's motion for new trial should be denied.

## CONCLUSION

Based on the foregoing, this Court should affirm the judgment for plaintiff.

**GRANZOTTO & WITTMANN, P.C.**

**/s/ Beth A. Wittmann**

**MARK GRANZOTTO  (P31492)**
**BETH A. WITTMANN (P63233)**
Attorneys for Plaintiff-Appellee
2684 Eleven Mile Road, Suite 100
Berkley, Michigan 48072
(248) 546-4649

Dated: July 10, 2025.

## <u>CERTIFICATION PURSUANT TO FRAP 32(a)(7)(C)</u>

Beth A. Wittmann, attorney for plaintiff-appellee, hereby certifies pursuant to

Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure that this brief was typed

using the Corel Word Perfect word processing program.  That program has a function

which can calculate the total number of words contained in a document.  According

to that program function, there are 14,643 words in this brief.


 /s/ Beth A. Wittmann
Counsel for Plaintiff-Appellee

## DESIGNATION OF RECORD ON APPEAL

Pursuant to Sixth Circuit Rule 29(c), plaintiff-appellee designates the following additional filings in the district court for inclusion in the Record on Appeal:

| Description Of Entry | Date Filed | RE No. | Range |
|---|---|---|---|
| Order | 4/4/22 | 56 | 853-857 |
| Response to Motion for Summary Judgment (w/Exhibits) | 5/3/22 | 64 | 1159-1638 |
| Response to Motion to Dismiss (w/Exhibits) | 10/19/22 | 78 | 1932-1966 |
| Tusar Memo | 6/15/23 | 116-2 | 2763-2765 |
| Amended Order | 2/15/24 | 159 | 3739-3740 |
| Verdict Form | 2/16/24 | 162 | 3743-3744 |
| Final Jury Instructions | 2/16/24 | 164 | 3747-3774 |
| Transcript Dated February 16, 2024 | 3/11/24 | 175 | 5108-5119 |

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2025, I electronically filed the foregoing paper with the Clerk of the United States Sixth Circuit Court of Appeals, using the ECF system.

<u>  /s/ Beth A. Wittmann                  </u>